1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


------------------------------:
                              :
UNITED STATES OF AMERICA       :
                              :
                              :
     -vs-                      :          Case No. 1:12-cr-38
                              :
                              :
JENNIFER CHURCHILL,            :
               Defendant.      :
                              :
------------------------------:




HEARING ON MOTIONS


June 11, 2012


Before:  Leonie M. Brinkema, USDC Judge




APPEARANCES:

Kimberly R. Pedersen and Patricia M. Haynes,
Counsel for the United States

Kerri L. Ruttenberg and Christopher J. Smith,
Counsel for the Defendant

1          THE CLERK:  Criminal case 12-38, the United States of

2     America versus Jennifer Churchill.  Will counsel please note

3     their appearances for the record.

4          MS. PEDERSEN:  Good morning, Your Honor.  Kim

5     Pedersen and Patricia Haynes for the United States.

6          THE COURT:  Good morning.

7          MS. RUTTENBERG:  Good morning, Your Honor.  Kerri

8     Ruttenberg and Christopher Smith for Ms. Churchill.  She has

9     waived her appearance today, and we filed a waiver with the

10    court.

11         THE COURT:  Right, we saw that.  Before we start the

12    motions that have to be addressed today, I want to ask the

13    Government, since discovery is just about finished, the trial

14    is next Monday, what direct evidence do you have, what evidence

15    do you have, direct evidence that this defendant knew D.C.

16    Escorts or D.C. Classy was a prostitution rig?

17         You have debriefed most of the co-defendants at this

18    point.

19         MS. PEDERSEN:  We have, Your Honor.  We have two of

20    the defendants who have already pleaded guilty before the Court

21    who have been interviewed and prepared for trial, and they are

22    prepared to testify that they had conversations and

23    communications, primarily communications and texts with Ms.

24    Churchill, but it is their understanding from other

25    co-conspirators that the defendant knew that they ran an escort

3

1    service.  That an escort business is a euphemism for a

2    prostitution business.

3            THE COURT:  Well, if that's the case, why aren't all

4    the escort businesses shut down?

5            MS. PEDERSEN:  Well, this one has been shut down.

6            THE COURT:  I understand that.  But the problem in

7    this case, and I understand it's difficult for the Government

8    to make an incorrect case, but I am troubled by the fact that

9    every other defendant, who I think was properly charged in the

10   indictment and who has an adequate factual basis and who has

11   admitted a knowing participation in a prostitution operation, I

12   have no problem with that, but this defendant, who is located

13   in California, has maintained consistently that, yes, she knew

14   she was working for an escort service, but she did not know it

15   was involved in prostitution.  And I have not yet heard a

16   single piece of direct evidence that she had such knowledge.

17           MS. PEDERSEN:  There are two additional witnesses,

18   Your Honor, that were not charged as part of the conspiracy.

19   One of whom is the defendant's former boyfriend and the father

20   of her child, who is the one who introduced her to this

21   business.  And that individual is prepared to testify that he

22   ran a photography business and he ran a number of photography

23   businesses, one of which was marketed primarily at escorts and

24   prostitutes.

25           And that the defendant, with whom he had an intimate

4

1    relationship, was aware of that because she lived with him and

2    he lived with her, and that she worked in this business, and

3    that she created for him a business, a Web Site for this

4    business called Lust Photography which was marketed to the

5    adult entertainment industry and to primarily prostitutes and

6    escorts.

7            That he took such photos.  That the defendant was

8    present at those photo shoots, was aware of the occupation of

9    these women.  The fact that they called themselves escorts, but

10   were actually in fact prostitutes.  And that he referred

11   clients to her, a number of clients for whom she made Web sites

12   for these women to advertise themselves as prostitutes, but who

13   were engaged in prostitution.

14           We also have a prostitute who is prepared to testify

15   under oath that she had her photographs taken at the

16   ex-boyfriend's studio, and that she knew the defendant, and

17   that the defendant was aware of the nature of her business as a

18   prostitute.  And she asked the defendant and paid the defendant

19   to create a Web Site for her to market her prostitution

20   business on the Internet.

21           THE COURT:  All right.  All that evidence has been

22   turned over to the defendant?

23           MS. PEDERSEN:  They are being made aware of it right

24   now, Your Honor.  That information was going to be presented in

25   the trial exhibits which would be filed today and made

5

1    available, and also in the Jencks material that will be

2    provided on Wednesday.

3         But this may be the first time they are hearing it

4    directly from the Government in terms of what the evidence will

5    be.

6         THE COURT:  Well, one of my concerns is I have

7    granted the defendant's request to have her travel and living

8    expenses covered will she is here for the trial.  It does

9    concern me that we not waste tax dollars on relatively minor

10   defendants or on those for whom the case is extremely weak.

11   And I wanted to make sure that the Government understood why I

12   am concerned about this.  Because I have taken all but one of

13   the pleas in this case, and I think a couple of times I have

14   asked the people about Ms. Churchill, and at least the answers

15   from those folks seems to indicate there is not much evidence

16   against her.

17        One last question.  You have been through a fair

18   number of her e-mails, phone and other records.  Does the

19   Government have an estimate as to the percentage of her

20   business that is involved in anything of a sexual nature?

21        MS. PEDERSEN:  Sexual nature?  The indictment charges

22   her participation in the conspiracy from 2009 until the arrest

23   in January of 2012.

24        THE COURT:  During that three-year time period

25   though, she is running a business, right?

6

1          MS. PEDERSEN:  Basically her income was derived from

2     Classy D.C. Escorts and two other prostitution businesses.

3          THE COURT:  That's it.  So, she wasn't doing--

4          MS. PEDERSEN:  She was getting child support from her

5     ex-boyfriend to pay for her child's expenses.  In 2009 she did

6     some modeling, received income from that.  But in 2010 and

7     2011, it appears from the information that was obtained from

8     her own computers, that her income was derived primarily from

9     working for these businesses.

10          THE COURT:  Okay.  That's fine.

11          Ms. Ruttenberg--

12          MS. PEDERSEN:  Oh, wait, let me, actually let me

13     correct that, Your Honor.  During some period of time she did

14     obtain a nursing certificate, so she was employed as a nurse.

15     So, she had approximately, I would say 25, $27,000 in income as

16     a nurse.  The remainder of her income, her supplemental income,

17     as you will, was from working for the prostitution businesses.

18          So, I just wanted to clarify that.

19          THE COURT:  Ms. Ruttenberg.

20          MS. RUTTENBERG:  Yes, Your Honor, just to further

21     clarify that issue.  Ms. Churchill is a nurse.  We have, as we

22     have told the Government, we have her tax returns.  In 2010 she

23     earned approximately what Ms. Pedersen said, it was around

24     $28,000 or so as a nurse.  But she obtained full-time

25     employment in 2011 and earned about $46,000 in total.  And that

1    was for her nursing.

2              She is caring for her son as a single parent.  She

3    does receive limited child support from the child's father.

4              From what we've been able to determine and from the

5    proffer that the Government gave today, there is no direct

6    evidence that Ms. Churchill knew that Classy D.C. Escorts was

7    engaged in prostitution.  She certainly knew that it was an

8    escort service simply because she was putting a watermark on

9    the photographs that she was being asked to retouch.

10             But it sounds to me like the extent of the

11   Government's evidence at most shows that Ms. Churchill knew

12   that some escorts that she had worked with in California,

13   completely unrelated to Classy, may have also engaged in

14   prostitution.  Not all of them.

15             And the nature of the business that she and this

16   individual who is the father of her son, they were in a

17   four-year relationship living together and broke up when their

18   son was about two, this was a very well-established photo

19   studio in California.  The work, the business that they were

20   marketing to, what Ms. Pedersen terms escorts and prostitutes,

21   it's the exact same photography work, the same studio, it was

22   simply a different site that was set up for different marketing

23   purposes.  But it is the exact same business.

24             THE COURT:  And he has not been prosecuted by

25   California or Virginia authorities?

8

1          MS. RUTTENBERG:  That's my understanding, Your Honor.

2          Which brings me to one of our biggest concerns and

3    the reason that they wanted to be before the Court today, which

4    has to do with the Government's failure to comply with this

5    Court's order from April 27 to disclose Brady and Giglio

6    material immediately.

7          We had filed a motion to compel when our formal

8    requests to the Government went unanswered.  We were here

9    before the Court on the 27th on other motions.  The Court

10   addressed the discovery issue and that day granted our motion

11   and instructed the defense to file some brief the next week if

12   we didn't have the material.

13         We were in touch with the Government.  I had still

14   hoped that we would receive it.  So, instead of filing a motion

15   that next week, I just filed a status report with the Court and

16   said that if I didn't have it by the next week, I would file

17   something.  And in fact, I did have to do that, filed a second

18   motion, which I believe I asked that the Court reiterate it's

19   prior ruling that the discovery be produced immediately.  That

20   was on May 9.

21         Since then the defense has received no Brady or

22   Giglio material from the Government.  And we expect, and I

23   could detail it for the Court, although with the caveat that I

24   don't believe it is the defense's burden to do so, with what we

25   think they actually have.

9

1              And I would suggest to the Court that a substantial

2    amount of that material I would expect relates to Ms.

3    Churchill's ex-boyfriend, the father of her son, who the

4    Government is in touch with.

5              We are not in a position to reach out to this person

6    at this point.  I believe he has, I don't know this for a fact,

7    but my understanding is that he has counsel of his own.  Which

8    would make sense given the reasons that they are putting him on

9    the stand.

10             And in his last communication to me, I don't have any

11   personal knowledge of this, it's simply what he told me, and I

12   tell the Court this--

13             THE COURT:  When you say he, counsel or the witness?

14             MS. RUTTENBERG:  When the witness contacted me at one

15   point in the last couple of weeks, he told me that the FBI has

16   been talking to him several times.  That they told him,

17   particularly after he said he had obtained a lawyer or was in

18   the process of retaining a lawyer, that they began yelling at

19   him, cursing at him, and telling him that the Government is on

20   his side.  The defense is going to torch him on the stand.  And

21   only cooperating with the Government is going to allow them to

22   prepare him for what the defense in this case was going to do.

23             So, this gentleman is not someone that I am in a

24   position to speak to.  It's not my burden anyway with respect

25   to the Brady.  And based on some filings, a representation that

10

1    the Government made in its filing about what he has said, we

2    also very much expect that he has given them _Brady_ and

3    exculpatory information.

4           I would also think that this person who, this is the

5    first I am hearing of this from the Government, but this person

6    who Ms. Pedersen described as a prostitute who had had

7    photographs done at the studio, I don't know who that is, but I

8    would expect that that person would also have _Brady_ information

9    because of my understanding of the types of communications that

10   happened at that studio.

11          Which is, it is a studio that does everything from

12   celebrities and commercial work to glamour photography, which

13   is the nature of this industry.  It's scantily-clad women in

14   sexy poses, and that's what glamour photography is.  And they

15   do a good deal of it.

16          But at this point, Your Honor, we are a week from

17   trial.  The Government has for six weeks, over six weeks now,

18   been sitting on a Court order for immediate production of _Brady_

19   and _Giglio_.  And at this point the defense would seek relief

20   from the Court.

21          There are five options that I have thought of that I

22   would bring to the Court's consideration as sanctions for

23   noncompliance and to restore the fairness in this case so that

24   we can proceed to trial.  The first remedy that the defense

25   seeks would be that the Government not be permitted to argue or

1    get any kind of instruction regarding deliberate ignorance or

2    willful blindness in this case.

3            Mens rea is at the heart of the case.  In the

4    objections that I filed with the Court, I raised other issues--

5            THE COURT:  It is an interesting argument.  I am

6    going to reject that one because we have to see, based on what

7    they have properly produced to you, assuming, I haven't said I

8    am going to do it, I were to say all discovery or all evidence

9    produced by this point may be used, and anything after can't.

10   Okay.

11           So, we would have to look at what you have already

12   gotten if the trial went forward on just that, would that be

13   sufficient to lay a basis.  I am not going to do that at this

14   point.

15           MS. RUTTENBERG:  I understand, Your Honor.  Of

16   course, our concern would be that if what hasn't been produced

17   yet is the favorable information, then we would want, we would

18   want to be able to use that.  And exclusion of the Brady is not

19   the remedy that the defense would be seeking because if they

20   are going to be putting those folks on the stand--  And I would

21   just simply note for the Court's consideration, and I

22   understand the Court is not going to rule on this today, that

23   because, not all, but most of the Brady that we have already

24   articulated we expect the Government has goes directly to the

25   heart of Ms. Churchill's lack of knowledge, lack of a

12

1    relationship with the other defendants, lack of a relationship

2    with other conspirators indicted or not, that they shouldn't

3    get to capitalize on that lack of disclosure and get a

4    deliberate ignorance instruction.

5            THE COURT:  All right.

6            MS. RUTTENBERG:  We also would propose to the Court

7    some kind of general adverse inference instruction in light of

8    the situation that we are in now.  The rules, obviously, are in

9    place to assure fairness.  When a party fails to fulfill its

10   responsibilities, that can be remedied by the Court in some

11   respect through an instruction that the Government has failed

12   to fully disclose information to the defense.

13           I could tender to the Court, I brought a copy with me

14   today, the instruction that was used in the U.S. versus W.R.

15   Grace case, it is case 9:05-cr-007, district of Missouri, 2009,

16   and on PACER it's docket number 1147.

17           Now, that instruction would, obviously, have to be

18   modified to fit what has happened in this case.  There it had

19   to do with a particular witness' testimony.  But there was very

20   general language in that instruction about the Government's

21   failure to disclose information favorable to the defense.

22           A third option that I would propose to the court

23   would be a specific adverse inference instruction if, upon

24   receiving the Brady information from the Government, again, I

25   am sort of in this zone of having to guess what might be out

1    there and how I might be prejudiced, which the case law does

2    suggest is not the defense's burden to do, but if it becomes

3    clear that there is a specific way in which there is a

4    particular witness that we can't adequately cross-examine, then

5    a specific adverse inference instruction would be another

6    potential remedy.

7         The fourth potential remedy I would bring to the

8    Court is potentially stipulations as to the late Brady and

9    Giglio.  But way of example, we disclosed to the Government

10   early on, and actually I believe in the last hearing that we

11   had before Your Honor the Court was asking my colleague, Mr.

12   Smith, about whether Ms. Churchill paid taxes on her income, we

13   have told the Court, we told the Government that she did on not

14   only her nursing income, but on all of her income from her

15   photo retouching business.

16        To the extent that the other defendants or others in

17   this industry did not pay taxes, that would be a distinguishing

18   characteristic.  And when I told the Government that Ms.

19   Churchill did, the Government's response was, that sets her

20   apart from most folks who engage in criminal activity.

21        So, a stipulation about, you know, others not paying

22   taxes and Ms. Churchill did, those kinds of issues, if there is

23   Brady that we have not received.  Which, of course, would

24   include things like the limited nature of her role, that others

25   did not talk to her, meet her, whatever is out there that we

14

1    don't know yet that the Government knows through proffers.

2         And then finally, Your Honor, and I can't suggest

3    anyone at the moment because I don't have the Brady, but where

4    appropriate, to preclude certain witnesses from testifying.

5         Obviously, if Brady was withheld, then it may be that

6    we want those witnesses, and that wouldn't be the remedy that

7    we were looking for, but I simply raise it with the Court

8    because it was something that I was thinking of that might

9    potentially restore fairness.

10        THE COURT:  All right.  Ms. Pedersen, I don't have to

11   tell you, I am very concerned about the Brady/Giglio issue

12   because your office, at least with me, has recently had a

13   troubling track record of not meeting it obligations, resulting

14   in an awful lot of extra work.  Not only is the Sterling case

15   on appeal, on the eve of trial we had these issues come up, but

16   I have another one that went all the way to trial, it is

17   docketed at the Fourth Circuit.  The Fourth Circuit has

18   remanded it because the defense had filed a motion for a new

19   trial based upon new evidence that would have constituted

20   definitely Brady material that the Government produced after

21   the conviction.

22        Now, this behavior is impossible to be tolerated.  It

23   is too much work.  It is absolutely unfair.

24        So, I want you to bend over backwards, you either

25   have a case or you don't, and this defendant is not going to be

1    unable to unravel it in four or five days, you must by close of

2    business tomorrow reveal every scintilla of arguably Brady

3    material or arguably Giglio material to the defense.

4            Do you understand that?

5            MS. PEDERSEN:  We do, Your Honor, but we share the

6    Court's concern for Brady.  I think the Government is well

7    aware of those particular issues before the Court, but also in

8    general.  You know, the discussion of Brady comes up

9    frequently, it's in the press.  Our office is very well aware

10   of that, Your Honor.  And Ms. Haynes and I are taking special

11   precautions to make sure we follow our legal and ethical

12   duties.  We take that very seriously.

13           And I want to make sure that Brady isn't just thrown

14   around as an accusation against the wall against the

15   Government.  We are working very diligently and very hard in

16   this case to do the right thing.  And the right thing is to

17   make sure that justice is done.

18           THE COURT:  Yes, but I am saying if co-defendants who

19   have pled guilty have said in their debriefings, and at least

20   one or two have said in their plea colloquies, they never heard

21   of the defendant, they have never met her, that's Brady.

22           MS. PEDERSEN:  You are right, Your Honor, and that's

23   out in open court.  The defense is aware of that.  The Court is

24   aware of that.  We all know that's part of the Government's

25   case.

16

1          But let's be clear, it's not, it's not clear to me

2    from what the defense has just said to the Court--  What I

3    heard was that they are aware of a witness, the photographer

4    that is the defendant's former live-in boyfriend and father of

5    her child, they are in possession of some information that they

6    say is Brady, but we don't know what they're alleging.

7          THE COURT:  That's not what they're saying, I didn't

8    hear it that way.

9          MS. PEDERSEN:  I don't know what Brady is that they

10   are alleging that we are withholding.

11         THE COURT:  Let me tell you what I think Brady would

12   be if you have it.  Your debriefings--  He is, obviously, going

13   to be a key witness.  He is probably the person closest to this

14   defendant.  And if he is going to say various things you say he

15   is going to say, certainly all his statements are Jencks, they

16   must be turned over on the schedule for that, but anything you

17   have about his background, including the fact that he is

18   involved in prostitution, which is a crime, you have got to

19   turn over now.

20         MS. PEDERSEN:  It has been turned over, is what I am

21   trying to tell the Court, Your Honor.  That information that we

22   gleaned, we got from her client's computer when it was seized

23   and when that information was turned over.  It's in their

24   possession.

25         THE COURT:  You haven't debriefed him?

17

1          MS. PEDERSEN:  He was interviewed, Your Honor, yes.

2          THE COURT:  Well, what do the 302s say?

3          MS. PEDERSEN:  The 302s said that he ran a business

4    that was bifurcated, some of it is legitimate, some of it is

5    dedicated to escorts, and that this defendant assisted him in

6    that.  She was aware of that.  She created a Web Site so he

7    could market that business to the prostitution industry.

8          It's consistent with all the information that we

9    obtained from the defendant, is what we're trying to say.  She

10   is in the best position to know.

11         I mean, Your Honor, the defense attorney said that

12   the witness contacted her, that she was--  They haven't

13   subpoenaed that witness.  Either they have interviewed him and

14   he has said things that is not favorable to their defense and

15   they are choosing not to call him--  They were in the position

16   before the Government of interviewing him.  They are either

17   withholding that information from the Court because it is not

18   favorable or consistent to their defense.

19         It's unfair to say that the Government is withholding

20   information because we're not.  The information we obtained, we

21   got from her computer, they are in possession of that.

22         And they had first crack at that witness.  It's

23   telling to me that they do not have him under subpoena because

24   they know that he is not going to help their client's defense.

25         THE COURT:  All right.  Well, I will have you submit

18

1    the 302 to chambers in camera so I can just be satisfied that

2    there is nothing in the 302 that could reasonable be considered

3    Brady or Giglio.

4              MS. RUTTENBERG:  Your Honor, may I just be heard on

5    that last point very briefly.

6              THE COURT:  Yes, you certainly may, yes.

7              MS. RUTTENBERG:  I just want to make the record very

8    clear that it is not simply this gentleman's 302 that we are

9    concerned with.  We are concerned because my information about

10   this gentleman is that his original communications were all

11   exculpatory to Ms. Churchill.  There are all sorts of reasons

12   why we're not flying certain people in from California to

13   testify at trial.

14             These two had a very difficult break-up.  There is

15   all sorts of other reasons why we haven't put him under

16   subpoena.

17             So, for the Government to be suggesting that it must

18   be because he hurts our client, is absolutely incorrect.

19             THE COURT:  All right.  Now, do you have copies of

20   these e-mails, these exculpatory e-mails?

21             MS. RUTTENBERG:  No.

22             THE COURT:  You said the early communications were

23   exculpatory.

24             MS. RUTTENBERG:  Early communications that I had with

25   this witness before there was a lawyer.  And they were very

19

1    limited.  This was, you know, him contacting me.  I didn't

2    contact him.  But this is not a good relationship between these

3    two.  He is the father of her son.  They have been broken up

4    for over two years.

5              But I think it's disingenuous for the Government to

6    represent that they have no idea what the Brady information is.

7    We have actually gone way beyond our obligations and even

8    speculated with specificity that the comment that they included

9    that there was someone, a subject who had seen our client on an

10   escort Web Site, based on my knowledge, not through this man,

11   but based on my own knowledge of that situation, that

12   underlying situation, I would have fully expected that in that

13   conversation, which I think was likely the first communication

14   that the FBI had with him, that he would have said that the

15   picture was stolen.

16             They didn't represent that to the Court.  They said

17   that when the defendant was asked, she said the picture was

18   stolen.

19             And it's a big deal, Your Honor, we have already

20   addressed this through motions, the Court has granted it, the

21   Government not be allowed to argue or suggest through questions

22   that our client was some kind of escort or prostitute, which

23   she has never been in life.

24             THE COURT:  The Government has agreed not to do that.

25             MS. RUTTENBERG:  Exactly.  But that comment was

20

1  precisely the one that sparked our motion because we saw what

2  was happening with that.  And that type of information is

3  Brady.

4            Information, for example, about the limited role that

5  our client played in this man's photography business.  She is

6  not a photographer.  They were in a relationship.  She was

7  going to nursing school.  She was doing other things.  She was

8  doing modeling on her own.

9            So, whatever is sort of limiting her role in that

10  business is going to be Brady information.  And my concern is

11  if the Government views the Court's order from April in terms

12  of immediate disclosure of Brady--  And again, we have received

13  nothing.  So, for the Government to say, well, you came to a

14  plea hearing and you heard somebody else testify that they

15  didn't know here at the plea hearing--

16            THE COURT:  You have had no formal--  They usually

17  send a cover letter, attached is the Brady material that we

18  have.  Nothing like that?

19            MS. RUTTENBERG:  We received our own client's 302,

20  which is, obviously, her statements.  When we came in, when we

21  filed a letter with the Government on April 11, we were asking

22  for formal Brady.  We didn't receive a response to that.

23            When we filed our motion to compel and then we were

24  before the Court, we received no further Brady information.

25            When we didn't receive any the next week and the next

21

1    week and I filed the second motion to compel, we still haven't

2    received anything further that would constitute any kind of

3    Brady information.  We received some additional data that was

4    taken from cell phones, and that's no longer an issue because

5    the last cell phone the Government has returned to us and said

6    they weren't going to be searching.

7            So, the only issue is this Brady/Giglio material,

8    Your Honor, and we haven't received it.  And there is, from

9    other defendants, there are 302s, there are proffer sessions.

10   From unindicted co-conspirators and informants, there may be

11   302s there.  Grand jury testimony, proffer sessions with them.

12           And we have really gone to great lengths to try to

13   speculate and guess what they might have.  We have detailed it

14   in every writing.  It is included, you know, the defendant's

15   efforts to hide the unlawful nature of the business, the

16   relationship or lack thereof with Ms. Churchill.

17           And it's more than just, well, they told the Court

18   during the plea that they didn't know who she was.  If they

19   have any information about the photo retouching--  That issue

20   is so important to the Government that they have proffered an

21   expert to talk about the role of photographers and photo

22   retouchers.

23           The idea that they never asked any of these folks

24   about how the business operated and about the photographs.  And

25   one of their, an unindicted co-conspirator, I believe, I may be

22

1    wrong, but I believe is the person who actually was running the

2    Web Site for Classy and uploading the pictures.

3         So, I have idea what these people have said about our

4    client.  My expectation would be that they didn't know who she

5    was.  But if that's information that is coming out, if these

6    people are testifying, I would want to be able to use it.  If

7    they are not testifying, I may be able to use it in other ways

8    with the case agent or someone along those lines.

9         There is so much that we believe is out there that

10   would show her lack of involvement with this enterprise.  That

11   all she was doing, there is thousands of e-mails, we have read

12   them, the Government has read them, and all of the e-mails are

13   of the nature, here are some photographs that we need edited.

14   You know, sometimes they will specify what to do.  A lot of

15   times they don't because it was the same lighting issues over

16   and over again.  She sends them back and there is a PayPal that

17   would go for $20 a picture.  Which was, you know, the standard

18   that she charged for everybody.

19             MS. HAYNES:  Your Honor, may I respond briefly to

20   that?

21             THE COURT:  Well--

22             MS. HAYNES:  The only reason--

23             THE COURT:  Go ahead.

24             MS. HAYNES:  Your Honor, I apologize.  The only

25   reason is that I had some conversations with the defense

23

1    counsel.  I am not sure that Ms. Pedersen was present.

2              THE COURT:  All right.

3              MS. HAYNES:  So, I think I might be able to assist

4    the Court.

5              I don't think this whole Brady issue is as

6    complicated as it may seem.  Right after the arraignment in

7    this case I sat down with Ms. Ruttenberg, and Ms. Pedersen

8    might have been present for part of that conversation, and

9    basically told her face-to-face, we don't have any of our

10   defendants that are going to say that your client was ever told

11   directly--  Well, Your Honor, my recollection is that we had a

12   conversation when I told her, maybe it was on the telephone,

13   that none of our cooperators was going to say that they ever

14   specifically said, this is prostitution.

15             Some of our cooperators have not even met her client

16   and they had no dealings with her.  But that our cooperators

17   would say that she knew it was an escort business.  They called

18   it--

19             THE COURT:  How can they do that?  How can I say that

20   you know something?

21             MS. HAYNES:  Because they asked her to put on, Classy

22   D.C. particularly asked her to put on a watermark that said

23   Classy D.C. Escorts.  And they had conversations with her about

24   we have girls that are coming in, they need to get their

25   pictures up so that they can work.  If they don't have their

24

1    pictures up, they can't work.

2         But going back to the Brady, Your Honor.  I think

3    that we've already told her we don't have anybody that is going

4    to come in here and say, we used the word "prostitution" with

5    your client.

6         And so, I think we have already explained to her that

7    it is inferences and it's circumstantial evidence that we are

8    going to be using in this case.  There is no direct evidence.

9    And we have told her that there is no direct evidence.

10        THE COURT:  All right.  But that doesn't get past the

11   Brady issue because especially in a weak Government case, which

12   is this is going to be if it is indirect evidence, anything

13   that undercuts the credibility of any of your witnesses is

14   Brady.  That's how I view Brady.  And to be fair to this

15   defendant, you have an obligation to turn over anything that

16   any reasonable person would construe to be of that nature.

17        MS. HAYNES:  We understand that, Your Honor.

18        THE COURT:  To save your case if you get a

19   conviction, it's foolish not to give them everything.

20        MS. HAYNES:  We understand that, Your Honor.  And the

21   tax records, it is in our defendants' plea agreements that they

22   have to file amended tax returns because they had not properly

23   filed their taxes.

24        We understand, we understand what the Court is

25   saying, and we feel that we have already complied.  We will

1    ensure that we continue to comply and that everything is turned

2    over.

3           THE COURT:  Well, I am giving you the deadline of

4    close of business tomorrow for any and all conceivable

5    Brady/Giglio type material.  It has to be turned over.

6           MS. HAYNES:  That's understood, Your Honor.

7           THE COURT.  All right.  And if it comes time for the

8    trial and in the course of cross-examination one of your

9    witnesses says something that undercuts your case, even to a

10   small degree, and it hadn't been revealed properly to defense

11   counsel, the case may end right there.  I am going to be very

12   Draconian on this because if there is a conviction, I don't

13   want to have it coming back from the Fourth Circuit Court on a

14   motion for a new trial because something that was material was

15   withheld by the Government.

16          So, the burden is on you all.

17          MS. HAYNES:  We understand that, Your Honor.

18          THE COURT:  You know your case.

19          MS. HAYNES:  And we don't want it coming back either.

20          THE COURT:  All right, That's fine.

21          MS. PEDERSEN:  Your Honor, may I make one point just

22   so it is all out in the open.

23          THE COURT:  I am making one exception now to have two

24   lawyers address one issue.  It won't happen again.

25          Go ahead.

1          MS. PEDERSEN:  I think it is directly on point to

2     what the Court's concern is.  And I just want to make it clear

3     that it is my understanding that the defense attorney was in

4     contact with this Government witness who I will call the

5     defendant's ex-boyfriend.  That he had contacted them and made,

6     as she represented, exculpatory statements to her.  I am not

7     sure what she is talking about, but she has referred to him

8     making exculpatory statements to her.

9          I can only guess as to what those may be.  At some

10    point in time that photographer did tell an FBI agent that he

11    would be surprised if the defendant did anything illegal.  That

12    may be what she is referencing.  I am making that statement in

13    open court in the presence of defense counsel so they are aware

14    of a prior statement that he may have made.  It may have been

15    be consistent with a statement he made to them.

16          However, I want to reiterate to the Court that as of

17    Friday, June 8, he has come off that statement.  Those 302s,

18    would the Court like to review those 302s in chambers?

19          THE COURT:  All the 302s you have of that witness,

20    yes.

21          MS. PEDERSEN:  I will.  We will produce them this

22    afternoon.  We will produce them to the defense today, they can

23    have them.

24          THE COURT:  Okay.

25          MS. PEDERSEN:  It's not a big deal.  But it is

27

1    disconcerting to me that they are aware of this evidence.

2              THE COURT:  All right.

3              MS. PEDERSEN:  And as we come across additional

4    information, we will produce it.

5              THE COURT:  All right.  Now, the defendants have also

6    filed a motion for a proffer of alleged co-conspirator

7    statements.  That would come, I think, under Jencks.

8              MS. RUTTENBERG:  I am not sure, Your Honor, that it

9    would.

10             THE COURT:  Unless it is Brady.

11             MS. RUTTENBERG:  Yes.  Yes.  Unless, Your Honor, if

12   it is co-conspirator statements that are inculpatory according

13   to the Government, then our concern was simply that they would

14   need to satisfy the elements of the rule before those would be

15   proffered.

16             THE COURT:  All right.  We will have to wait for

17   that, for the trial itself.

18             But at this point the Government knows its burdens

19   under Jencks, Brady and Giglio on that.  So, I guess at this

20   point I will grant that motion in the sense that the proffer is

21   going to come through one of those vehicles.

22             There is a motion to preclude Detective Fitzgerald

23   from testifying as an expert.  What I am going to do on that

24   motion, I am going to hold it in abeyance.  I want to see how

25   strong the Government's case is before they call him.  If it is

28

1    just a phantom case and they are going to try to use this man's

2    knowledge of the escort/prostitution business to somehow be

3    able to have the jury infer that the defendant would have had

4    the same degree of knowledge, it's not proper.

5        There may be terminology that is appropriate to have

6    it defined.  It's a little hard to rule on this type of motion

7    before we get the context of the trial.  So, with that

8    position, it's held in abeyance.

9        I think that covers all of the specific motions that

10   were docketed.  Yes.

11       MS. RUTTENBERG:  Yes, Your Honor, other than there is

12   two unopposed motions.  I think Your Honor just ruled on the

13   travel expenses--

14       THE COURT:  That's been granted.  And the technology

15   order has gone out.  It is not exactly as you requested.  There

16   is no way you're bringing a BlackBerry or any other kind of

17   communication device into court.

18       MS. RUTTENBERG:  Very well, Your Honor.

19       THE COURT:  Each side gets one laptop.  And you need

20   to talk with Lance Bachman, make sure you have been in here so

21   you know how to use the system.

22       MS. RUTTENBERG:  We are scheduled for that Wednesday

23   morning, Your Honor.

24       THE COURT:  All right.  Ms. Pedersen or Ms. Haynes,

25   is there anything further on this case?

29

1          MS. HAYNES:  Just one, Your Honor.  Defense counsel

2    has filed a motion to call an expert themselves, a Mr.

3    Saglimbeni.  We expect we are going to file a brief motion

4    opposing that.

5          As the Court said, we don't exactly know how the

6    trial is going to play out.  At this point we don't believe

7    that his testimony will be relevant, and that will be the

8    grounds of our opposition.  But we are willing, of course, to

9    have the Court rule on it during the trial when it--

10          THE COURT:  Just file it for the record, but I won't

11    rule on that currently.

12          MS. HAYNES:  Certainly.

13          THE COURT:  Anything further?

14          MS. RUTTENBERG:  Your Honor, I had a few housekeeping

15    matters, if the Court would indulge me just for a moment.

16          THE COURT:  Briefly.

17          MS. RUTTENBERG:  With respect to the jury

18    instructions, both parties have filed proposed instructions.  I

19    just don't know what the Court's preference is, so I included

20    some objections with what I filed--

21          THE COURT:  Yes, you should file your objections to

22    each other's instructions as soon as possible.

23          MS. RUTTENBERG:  Okay.  And there is one instruction,

24    which is their aiding and abetting instruction, where I filed

25    an objection, but I have additional grounds.  Would the Court

30

1   want me to just supplement what I filed?

2        THE COURT:  Yes.

3        MS. RUTTENBERG:  Okay.  And with respect to voir

4   dire, does the Court have a standard list of questions?

5        THE COURT:  Yes.

6        MS. RUTTENBERG:  Okay.

7        THE COURT:  But it depends on the case.  So, submit

8   those that you feel are essential.

9        MS. RUTTENBERG:  All right.  Does the Court have a

10  preference when we submit them as to whether they are open

11  ended or yes/no questions?

12       THE COURT:  Whatever makes you comfortable.  I don't

13  have a preference.  I mean, I will probably rephrase them so

14  they are comfortable with me.

15       MS. RUTTENBERG:  Okay.

16       THE COURT:  I do all the voir dire.  Now, Ms.

17  Pedersen, how long do you estimate this case taking?

18       MS. PEDERSEN:  We have approximately, assuming all

19  the stipulations go through, about eight witnesses, fact

20  witnesses for Your Honor.  About two days.

21       THE COURT:  For the Government's case?

22       MS. PEDERSEN:  Yes.

23       THE COURT:  And, Ms. Ruttenberg, how long do you

24  have?

25       MS. RUTTENBERG:  Well, I don't know that I was

31

1    expecting eight witnesses.  I would say that at most we would

2    take a day.

3          THE COURT:  All right.  Given the length of the

4    trial, and it is summertime, I will sit 14 jurors.  The way we

5    do it here is we sit a panel of 14.  Nobody is designated an

6    alternate until at the very end of the trial, and then we pull

7    two random names, and they are Alternate 1 and Alternate 2, and

8    they leave at that point.

9          That means I will give each side one additional

10   peremptory.  So, you all have 11.  The Government, you have got

11   seven.

12         All right.  Anything further?

13         MS. RUTTENBERG:  Yes, Your Honor.  With respect to

14   just one last issue on the voir dire.  Which is, the Government

15   filed a press release on Thursday about this case, and it's

16   relatively detailed, it explains more than is in the

17   indictment.  It is limited for the most part to the pleas.

18   There was very little, if any, press about the case until then.

19   And since then it has been on television, radio, Internet and

20   print media.

21         And I am wondering if the Court regularly includes

22   voir dire about the press, or should I submit that?

23         THE COURT:  Yes, I do.

24         MS. RUTTENBERG:  Okay.  And I think my last question,

25   Your Honor, is about the exhibit binders.  Does Your Honor want

32

1   a binder of exhibits that we may use?  Do you want them

2   premarked?

3            THE COURT:  Yes.

4            MS. RUTTENBERG:  When would Your Honor like that

5   submitted?

6            THE COURT:  By 5 on Friday afternoon with the Clerk's

7   Office.

8            MS. RUTTENBERG:  By 5 o'clock this Friday?

9            THE COURT:  Yes.  Well, earlier than--  No, by 2

10  o'clock.

11           MS. RUTTENBERG:  Okay.  By 2 o'clock this Friday.

12  And you just want them premarked to start at number 1 with the

13  defense?

14           THE COURT:  That's fine.  And my Court Security

15  Officer, Mr. Wood, will have a hard copy set.  Despite the

16  computers and the technology, more than likely we're going to

17  wind up using the paper exhibits with the witness.  All right.

18           And then depending upon how well you want the Court

19  to be able to read the exhibits, you may want to have a set for

20  the Court as well.

21           MS. RUTTENBERG:  All right.  The only other question,

22  we may need to work on this with the Government, but in light

23  of the nature of this case, Your Honor, to the extent that

24  there are photographs or screen shots from Web sites, for

25  example, with racier photographs--

33

1          THE COURT:  So be it.

2          MS. RUTTENBERG:  Thank you.

3          THE COURT:  All right.  You all are free to go.

4   Thank you.

5          MS. RUTTENBERG:  Thank you, Your Honor.

6      -------------------------------------------------
                       HEARING CONCLUDED

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a true and

19     accurate transcription of my stenographic notes.

20

21

22
                        /s/  Norman B. Linnell
23            Norman B. Linnell, RPR, CM, VCE, FCRR

24

25