1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA    .    Criminal No. 1:12cr38
                        .
    vs.               .    Alexandria, Virginia
                        .    June 15, 2012
JENNIFER CHURCHILL,        .    2:00 p.m.
                        .
            Defendant.    .
                        .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF PLEA AND SENTENCING HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:        KIMBERLY RILEY PEDERSEN, AUSA
                        PATRICIA M. HAYNES, AUSA
                        United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314

FOR THE DEFENDANT:         KERRI L. RUTTENBERG, ESQ.
                        CHRISTOPHER J. SMITH, ESQ.
                        Jones Day
                        51 Louisiana Avenue, N.W.
                        Washington, D.C. 20001-2113

OFFICIAL COURT REPORTER:   ANNELIESE J. THOMSON, RDR, CRR
                        U.S. District Court, Fifth Floor
                        401 Courthouse Square
                        Alexandria, VA 22314
                        (703)299-8595

(Pages 1 - 39)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                      P R O C E E D I N G S

2                      (Defendant present.)

3           THE CLERK:  Criminal Case 12-38, United States of

4    America v. Jennifer Churchill.  Would counsel please note their

5    appearances for the record.

6           MS. PEDERSEN:  Good afternoon, Your Honor.  Kim

7    Pedersen and Patricia Haynes for the United States.  Your

8    Honor, we're here on a change of plea.

9           Before we begin, the government would just like to

10   advise the Court that on Monday at the motions hearing, there

11   were certain allegations that the government had not produced

12   *Brady* material in this case.  We just want to make it clear to

13   the Court that the government has produced all *Brady*, *Giglio*,

14   and Jencks in this case by the deadline set by the Court, and

15   it's our understanding based on communications with the defense

16   that they are satisfied with the government's production.

17          So we want to make it clear to the Court and to the

18   defendant that in this case, the plea is not a result of any

19   potential *Brady* dispute or issue that may have arisen, but we

20   believe it's a just and fair resolution of the case based on

21   the defendant's role in the conspiracy, based on the facts of

22   this case.

23          THE COURT:  All right, very good.

24          And for the defense?

25          MS. RUTTENBERG:  Your Honor, Kerri Ruttenberg and

3

1  Christopher Smith on behalf of Jennifer Churchill, who is

2  present.  I think for the most part, we agree with

3  Ms. Pedersen's representation.  The one issue that I would

4  simply raise is that we did receive a *Brady* production from the

5  government, a substantial one that did contain substantial

6  amounts in our view of *Brady* by the second deadline that the

7  Court set, which was when the Court said on Monday that it

8  needed to be produced by the end of the day on Tuesday, but

9  that, of course, we were there on Monday bringing it to the

10  Court's attention because the original order was for immediate

11  production in April.

12          THE COURT:  All right, you're satisfied that at this

13  point, and this is now Friday, since -- and that production was

14  done on Tuesday, that it's not the *Brady* issue that's driving

15  this plea?

16          MS. RUTTENBERG:  It is not the *Brady* issue that is

17  driving the plea, Your Honor.  It is -- we received about 1,400

18  pages of material on Tuesday evening.  We've had an opportunity

19  to review most of it.

20          I don't have any reason to believe that there is

21  other information out there at this time, and the government on

22  Tuesday or Wednesday sent me a letter saying that this is the

23  complete production of *Brady* from the government, and as we

24  stand here today, I don't have reason to believe that there's

25  more.

4

1          THE COURT:  All right.  As you know, the new Supreme

2    Court jurisprudence on plea bargaining and advising counsel --

3    counsel's obligation to advise the client as to the client's

4    options, the costs and benefits of going to trial versus the

5    plea, and any previous plea offers, I assume this was the only

6    plea offer you've gotten that did not involve, did not involve

7    admissions as to the prostitution conspiracy?  In other words,

8    this plea is a pure copyright plea, copyright violation.

9          The facts from this case, at least as I've -- what

10   little I have of it, would appear to be much more

11   straightforward.  The scienter issue can't possibly be an issue

12   under these facts as I understand it, and so I just want to

13   make sure that you've fully discussed all these aspects with

14   Ms. Churchill.

15          MS. RUTTENBERG:  We have, Your Honor, including the,

16   the nature of this plea, which appears to us and, I believe,

17   from the government, they'll correct me if I'm wrong, that this

18   is actually an infraction.  I'm not even sure that it's a

19   misdemeanor under the, under the statute, because the amount

20   of -- the sentence is a fine with no jail time, as opposed to

21   over five days, which would make it a class C misdemeanor.

22          The licensing issue for her nursing license was of

23   significant concern to Ms. Churchill, and this would not affect

24   that, in the same way that a plea that had -- she couldn't have

25   pled to something that had a scienter element about the

5

1    underlying prostitution business, but this particular plea

2    doesn't involve that, as Your Honor pointed out, and in light

3    of the infraction nature of this plea, we don't believe that it

4    puts her nursing license at risk.

5           THE COURT:  Now, there's no plea agreement in this

6    case; is that correct?

7           MS. PEDERSEN:  That's correct, Your Honor.  We have

8    no written plea agreement.  We do have some agreements that

9    we've made orally in the course of the past couple days.  One

10   agreement is that the government advised the defendant we would

11   not be asking the Court for jail time.  That was something that

12   we had discussed orally.

13          And actually, we had been in plea discussions, I

14   think, as long as three weeks ago, just to advise the Court.

15   The defense had first proffered this charge to the government

16   as an offer to plead to that count.  The government rejected it

17   approximately three weeks ago.  So it was the defendant that

18   had suggested this originally.

19          THE COURT:  All right.  And is it correct that it's a

20   crime for which there is no period of incarceration even

21   provided for under the statute?

22          MS. PEDERSEN:  I think that is correct, Your Honor.

23   We can give you a case -- the citation to this --

24          THE COURT:  So it's basically, almost like a CFR

25   violation.

6

1          MS. PEDERSEN:  I think it is characterized perhaps as

2    an infraction if you look at it in terms of the misdemeanors.

3    It's -- because the sentence is five days or less, under 18

4    U.S.C. 3559, which classifies the offenses for sentencing,

5    under subsection (a)(9), five days or less, or if no

6    imprisonment is authorized as an infraction.

7          THE COURT:  All right, that's very interesting.

8          All right, then I think it's time for the defendant

9    to come up and be placed under an affirmation.

10         JENNIFER NUKUL CHURCHILL, DEFENDANT, AFFIRMED

11         THE COURT:  All right.  Ms. Churchill, you have now

12   taken a promise to tell the truth in answering all of the

13   Court's questions.  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  That means that if you should knowingly

16   lie to the Court as to any issue, you could be prosecuted for a

17   new and separate crime called perjury.  Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  All right.  For the record, what is your

20   full name?

21         THE DEFENDANT:  Jennifer Nukul Churchill.

22         THE COURT:  Are you also known as Jennifer Nukul?

23         THE DEFENDANT:  Yes.

24         THE COURT:  All right.  Is Churchill a married name?

25         THE DEFENDANT:  No.

7

1                    THE COURT:  All right.  So where does Nukul come

2    from?

3                    THE DEFENDANT:  Nukul is my middle name.

4                    THE COURT:  I see, all right.  And how old are you?

5                    THE DEFENDANT:  I'm 28 years old.

6                    THE COURT:  How much education have you completed?

7                    THE DEFENDANT:  I'm sorry?

8                    THE COURT:  How much education, how much schooling

9    have you completed?

10                    THE DEFENDANT:  I got my licensed vocational nurse.

11   I went to a trade school, so some college.

12                    THE COURT:  So you have your license at this point?

13                    THE DEFENDANT:  Yes.

14                    THE COURT:  All right.  Do you have any criminal

15   convictions in your past for which you are currently on

16   probation or parole?

17                    THE DEFENDANT:  No.

18                    THE COURT:  Are you presently being seen by a doctor

19   for any physical or mental condition?

20                    THE DEFENDANT:  I had gone to my primary care doctor

21   early on this year after my arrest, and I got prescription

22   medication for, for anxiety.

23                    THE COURT:  All right.  Are you taking that every day

24   or just when needed?

25                    THE DEFENDANT:  Just when needed.

8

1              THE COURT:  All right.  Have you had any medications

2    today?

3              THE DEFENDANT:  No.

4              THE COURT:  And within the last 24 hours, have you

5    taken any prescription or non-prescription medication of any

6    kind?

7              THE DEFENDANT:  Yes.

8              THE COURT:  What was that?

9              THE DEFENDANT:  Last night, I took a Xanax.

10             THE COURT:  All right.  Now, are you still feeling

11   the effect of the Xanax in any respect?

12             THE DEFENDANT:  No.

13             THE COURT:  Now, you've traveled here from

14   California, I guess, on a red-eye?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Are you in any respect feeling the

17   effects of that flight?  In other words, are you tired, having

18   any problem focusing or concentrating?

19             THE DEFENDANT:  I'm a little tired, but I'm not

20   having any difficulty focusing.

21             THE COURT:  All right.  I assume you are a United

22   States citizen, correct?

23             THE DEFENDANT:  Yes.

24             THE COURT:  All right.  Are you at this time under

25   the influence of any alcohol or drugs?

1          THE DEFENDANT:  No.

2          THE COURT:  All right.  Ms. Churchill, there are some

3    waivers that you have signed here, and I want to make sure we

4    go over those first.  Now, I've got a waiver of venue.  I want

5    to make sure, I should have a waiver of -- is there a waiver of

6    indictment?

7          MS. PEDERSEN:  No, ma'am, because she has no right to

8    grand jury indictment with this type of offense.

9          THE COURT:  For this low an offense, okay.

10          Well, the waiver of venue indicates -- is that your

11   signature on the waiver?

12          THE DEFENDANT:  Yes.

13          THE COURT:  You signed that today?

14          THE DEFENDANT:  Yes.

15          THE COURT:  All right.  And did you understand that

16   this offense most likely should have been prosecuted -- I think

17   it probably could be prosecuted here as well but most likely

18   would be prosecuted in California, because that's where the

19   actual touching up of the photograph, erasing of the copyright

20   occurred, but under this waiver of venue, you're giving up your

21   right to have this matter heard in California.

22          Is that what you understood you were doing when you

23   signed the waiver?

24          THE DEFENDANT:  Yes, that's correct.

25          THE COURT:  And did anybody promise you any special

1    treatment by the Court or any special favors if you would sign

2    the waiver?

3              THE DEFENDANT:  No.

4              THE COURT:  Did anyone put any force or pressure on

5    you to sign the waiver?

6              THE DEFENDANT:  No.

7              THE COURT:  And did you have enough time to

8    thoroughly discuss the waiver and its implications with your

9    counsel before you signed it?

10             THE DEFENDANT:  Yes, I did.

11             THE COURT:  All right.  Ms. Ruttenberg, did you

12   thoroughly go over this waiver with your client?

13             MS. RUTTENBERG:  I did, Your Honor.

14             THE COURT:  And you're satisfied that she's entered

15   it in a knowing and voluntary fashion?

16             MS. RUTTENBERG:  I am.

17             THE COURT:  All right, then the Court will accept the

18   waiver, finding it's been done with the advice of competent

19   counsel and done in a knowing and voluntary fashion.

20             And because this is an infraction, a very low-level

21   violation of law, you have no right to a grand jury review, so

22   the government has filed against you the following criminal

23   information:  It alleges that on or about April 18, 2010, in

24   the Eastern District of Virginia and elsewhere, that you, also

25   known as Jennifer Nukul, with fraudulent intent, did remove and

1    alter a notice of copyright appearing on a copyright -- on a

2    copy of a copyrighted work, to wit: a photograph.

3              That's the charge.  Do you understand it?

4              THE DEFENDANT:  Yes.

5              THE COURT:  And to that charge, how do you want to

6    plead?

7              THE DEFENDANT:  I'm guilty, yes.

8              THE COURT:  All right.  Now, before the Court accepts

9    your guilty plea, I want to go over a few matters with you

10   about your plea.  First of all, other than what Ms. Pedersen

11   has put on the record today, that is, that the government has

12   agreed it's not going to ask for nor probably could they ask

13   for any period of incarceration, and your understanding that

14   this conviction will not affect your license status as a nurse

15   in California, do you feel that there are any other agreements

16   or benefits that you're going to get from this plea?

17             THE DEFENDANT:  Not to my knowledge.  I mean, I'm not

18   sure I understand the question.

19             THE COURT:  Well, Ms. Ruttenberg, there's no formal

20   plea agreement, so I really don't know all the, you know, quid

21   pro quos going on here, but what is your understanding other

22   than the government breaking the case down?  I mean, they're

23   going to move to dismiss the indictment if this plea is

24   accepted.

25             MS. RUTTENBERG:  That's right, Your Honor.

1      THE COURT:  Other than that and not recommending any

2  jail time and representing that in their view, this will not

3  affect the license status, are there any other things you

4  believe the government has offered to the defense for this

5  plea?

6      MS. RUTTENBERG:  No, Your Honor.  I think

7  Ms. Churchill likely was thinking about just eliminating a risk

8  of trial in terms of the benefit of taking a plea, but there's

9  no -- in terms of quid pro quo, no, there hasn't been and none

10  has been conveyed to Ms. Churchill.

11      THE COURT:  All right.  And, Ms. Pedersen, are you

12  satisfied with that?

13      MS. PEDERSEN:  I just want to make a correction, Your

14  Honor.  We have no position one way or the other how this may

15  or may not affect her license.  That didn't factor into our

16  decision.  I think that was her concern.  We have no knowledge

17  about the practical implication of that.  Other than that,

18  you've recited the parties' understanding.

19      One other thing we discussed prior to coming into

20  court was that the parties would not object to an immediate

21  sentencing if the Court were to accept the guilty plea.

22      THE COURT:  All right.  Is that correct?

23      MS. RUTTENBERG:  I agree with that, but I would say

24  that we actually, what we had discussed was asking the Court

25  for immediate sentencing, particularly in light of

13

1    Ms. Churchill having to travel in from California, if the Court

2    was willing to do it.

3            THE COURT:  Now, Ms. Pedersen, this may be a little

4    bit up and down today because we don't have any papers.  What

5    is your understanding of the statutory sentence to which the

6    defendant might be -- what is, what does this thing call for?

7            MS. PEDERSEN:  The statutory sentence?

8            THE COURT:  Well, in other words, you know, in a

9    normal plea, you give me what their exposure is.

10            MS. PEDERSEN:  There's no jail time and up to one

11    year of probation and a fine of $2,500 -- up to -- I'm sorry,

12    not more than $2,500.

13            MS. RUTTENBERG:  Could I inquire through the Court of

14    the government the statutory cite for the probation?  As I read

15    the statute, which is 17 U.S.C. 506(d), the statute in full

16    reads, "Any person who with fraudulent intent removes or alters

17    any notice of copyright appearing on a copy of a copyrighted

18    work shall be fined not more than $2,500."

19            So if I could just get the authority for the

20    probation, that would be helpful.

21            MS. PEDERSEN:  We're looking at Title 18, United

22    States Code, section 3561(c), which sets forth the authorized

23    terms for probation.  It says for a felony, X; for a

24    misdemeanor, X; subsection (3), for an infraction, not more

25    than one year.

14

1              And on the 2012 edition, in the green book, it's on

2      page 1154, the bottom of the page, on the left-hand column.

3              THE COURT:  And it's not mandatory on the Court.  The

4      word "may" is used, so --

5              MS. PEDERSEN:  It's authorized by the law, Your

6      Honor.

7              THE COURT:  Okay.  Now, Ms. Ruttenberg, does that in

8      any respect change your decision to have your client plead

9      guilty today?

10             MS. RUTTENBERG:  No, Your Honor.  We've, we've

11     discussed the potential for probation as well.  I just -- we --

12     in light of the timing, it was just helpful to have the

13     statutory cite, but we've discussed it at length.

14             THE COURT:  All right.  So if, Ms. Churchill, you'd

15     go back to the lectern?  So do you understand that with a

16     guilty plea to this infraction, you are going to be exposed to

17     the possible -- a possible fine of up to $2,500 and the

18     possibility of one year of probation?

19             THE DEFENDANT:  Yes.

20             THE COURT:  All right.  And do you understand that if

21     you were on probation, then you're under the control of a

22     federal probation officer, and there might be requirements on

23     what you can do and what you can't do?

24             THE DEFENDANT:  Yes.

25             THE COURT:  All right.  And do you understand --

15

1    interesting theoretical question if the probation were

2    violated, what the possible ramifications of that could be.

3    Could the Court impose a period of incarceration for a

4    violation of probation on an infraction where there was never

5    any jail time authorized in the first place?

6              This is our first experience with this statute, and

7    so we're all a little bit --

8              MS. RUTTENBERG:  I can tell the Court what I've

9    discussed with my client on that front.

10             THE COURT:  All right.

11             MS. RUTTENBERG:  Which was that if the Court chose to

12   impose a fine and if we moved to sentencing today, then I

13   would, I would speak to that, that if there was some, some

14   nominal fine of some sort that the Court imposed and suspended

15   it, that if there was a term of probation that the Court also

16   imposed, that Ms. Churchill wouldn't be paying the fine unless

17   there was a violation of the probation.

18             That's how I had assumed that it might work in an

19   infractions context to parallel it to what we normally are

20   dealing with.  If the Court views it otherwise, then I would

21   defer.

22             MS. PEDERSEN:  Your Honor, without doing any legal

23   research, in making an analogy to a case if someone were

24   sentenced to a term of incarceration followed by a certain term

25   of supervised release, if the person were to violate supervised

16

1    release, however many years would remain on the supervised

2    release term would be the amount of time that they could be

3    returned to prison for.

4          There could be an analogy similar to that.  I just

5    don't know, because we haven't researched that issue in

6    advance.

7          THE COURT:  Well, I'm going to put the -- I'm going

8    to tell the defendant what I think is the correct approach, and

9    that will be it.  So if there were to be a problem down the

10   road, it would limit the ramifications, all right?

11         It's my view that if the Court does impose a period

12   of probation and there was a problem with the conduct on

13   probation, the only sanction could be either the unpaid portion

14   of the fine being imposed, if a fine was also imposed, and/or a

15   permanent record that probation has been unsatisfactory, which

16   can be a problem down the road.  I don't believe that

17   incarceration could be imposed simply for a violation of

18   probation under these circumstances, but in any case, that

19   sounds complicated.

20         Does that make you want to spend any time talking to

21   your attorney?

22         THE DEFENDANT:  No, I understand.

23         THE COURT:  Okay.  Now, have you had enough time to

24   discuss everything you know about this case with your counsel?

25         THE DEFENDANT:  Yes.

17

```
 1              THE COURT:  And have your two counsel advised you
 2     about the nature of this charge and any ways you could possibly
 3     defend yourself against the charge?
 4              THE DEFENDANT:  I have a very clear understanding.
 5     Yes, I feel like --
 6              THE COURT:  All right.  Are you fully satisfied with
 7     the way counsel have represented you in this matter?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  And do you understand that you still have
10     a right to plead not guilty and to go to trial on this charge?
11              THE DEFENDANT:  Yes, I understand that.
12              THE COURT:  If you were to do that, then the burden
13     would be on the government, even though it's an infraction,
14     they have to prove your guilt beyond a reasonable doubt.  Do
15     you understand that?
16              THE DEFENDANT:  Yes, I understand it.
17              THE COURT:  Now, because it's an infraction, I don't
18     think you have any right to a jury trial, but you would have a
19     right -- and it's arguable whether you even have a right to
20     counsel, but we would -- you would have counsel in this case
21     because these attorneys have taken your case pro bono.
22              So if you went to trial, you'd have the ability to
23     see and hear all the government's witnesses and evidence and
24     test it through your lawyers' questions.  Do you understand
25     that?
```

18

1           THE DEFENDANT:  Yes.

2           THE COURT:  And you'd have a right to have the Court

3    issue subpoenas that would require the presence of witnesses or

4    physical evidence at the courthouse that you could use in your

5    defense.  Do you understand that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  You could testify as a witness.  Do you

8    understand that?

9           THE DEFENDANT:  Yes.

10          THE COURT:  You could also choose not to testify, and

11   if you remained silent, no inference of guilt could be drawn

12   from your silence.  Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  You would be having a trial by the judge

15   alone, but the judge uses the same standard as a jury would,

16   and that is, you could not be convicted unless the government

17   proved your case -- the case beyond a reasonable doubt.  Do you

18   understand that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Now, because you have no formal plea

21   agreement with the government, you're going to still have a

22   right to appeal any sentence imposed in this case, although you

23   can't appeal the conviction itself.  Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And do you understand that by pleading

19

1    guilty, you're going to give up any defenses, including venue

2    or any other type of defense you might have to this case?

3            THE DEFENDANT:  Yes.

4            THE COURT:  All right.  And lastly, if you went to

5    trial on this charge and you were found guilty, you could take

6    an appeal of that finding of guilt to a higher-level court.  Do

7    you understand by being found guilty based on your guilty plea,

8    you're giving up your right to appeal this conviction?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Other than what's been represented orally

11   in court today, in your opinion, has anybody promised or

12   suggested to you that by pleading guilty to this charge rather

13   than going to trial on the charge, you would get a lighter

14   sentence or more favorable treatment by the Court?

15           THE DEFENDANT:  No.

16           THE COURT:  Has anybody put any force or pressure on

17   you to plead guilty today?

18           THE DEFENDANT:  No.

19           THE COURT:  All right.  Now, we have a statement of

20   facts, which is three pages long, and I see on page 3 what

21   appears to be your signature.  Did you sign the statement of

22   facts?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Now, I think there were a few changes

25   made between the draft given to the Court and what's in court

20

1   today.  Were you able to go over this current statement of

2   facts word for word?

3           THE DEFENDANT:  Yes.

4           THE COURT:  And are you satisfied that it's

5   completely accurate?

6           THE DEFENDANT:  Yes.

7           THE COURT:  So very briefly, I understand from this

8   that you are a photo retoucher, and you resided throughout the

9   time of this case in California.  Is that correct?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And -- now, when did you go to nursing

12  school?

13          THE DEFENDANT:  I went to -- I started nursing school

14  in the summer of 2007, and I completed my nursing program in

15  December of 2008.

16          THE COURT:  So by December of 2009, were you working

17  as a nurse?

18          THE DEFENDANT:  Not yet.  I hadn't found a position

19  yet.

20          THE COURT:  All right.  But you began retouching

21  photographs that were sent to you by electronic mail from

22  Classy DC Escorts, Model Elite, and DMV Indies; is that

23  correct?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And had you ever come to Virginia or D.C.

21

1    to meet any of these people?

2            THE DEFENDANT:  No.

3            THE COURT:  All right.  And then it says on page 1

4    here that on October 18, 2010, Mr. Asuen, who was an

5    owner/operator of Model Elite, sent you an e-mail from his

6    Yahoo! account to your account, and attached to the e-mail were

7    four photographs of scantily clad women.  Do you agree with

8    that?

9            THE DEFENDANT:  Yes.

10           MS. RUTTENBERG:  Your Honor, just for the record, it

11   was April 18.

12           THE COURT:  What did I say?

13           MS. RUTTENBERG:  October.  I just wanted --

14           THE COURT:  I'm sorry, April 18.

15           One of the photographs had the original

16   photographer's copyright or mark written in red across the

17   front of the photograph.  Do you agree with that?

18           THE DEFENDANT:  Yes.

19           THE COURT:  And were you aware of what a copyright

20   is?

21           THE DEFENDANT:  Yes.

22           THE COURT:  All right.  And did you understand that

23   it was against the law to tamper with a copyright?

24           THE DEFENDANT:  Yes.

25           THE COURT:  All right.  Now, in the e-mail that

22

1  Mr. Asuen sent to you, he asked you to remove the

2  photographer's name that's written in red, which is the

3  copyright indicator, right?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  And were you concerned about

6  that request?

7          THE DEFENDANT:  I knew that by removing the mark, I

8  was taking away the credit to that photographer, so I was aware

9  of what I was doing, yes.

10          THE COURT:  All right.  And did you understand that

11  by doing that, you might be depriving that photographer of

12  potential revenue or allowing some other person to claim that

13  they were the author of the photograph, in other words,

14  basically committing a minor fraud?

15          THE DEFENDANT:  Yes.

16          THE COURT:  All right.  And is it correct that you

17  returned the -- that you removed the copyright from the

18  photograph and then you returned the edited photograph to

19  Mr. Asuen via e-mail?  Is that correct?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  Now, do you understand that

22  if the Court accepts your guilty plea today, there'll be no

23  further trial, and you'll be found guilty today?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Do you make any claim whatsoever that

23

1    you're innocent of this charge?

2              THE DEFENDANT:  No.

3              THE COURT:  How then do you plead?

4              THE DEFENDANT:  I am guilty.

5              THE COURT:  All right.  And, counsel, have you had

6    enough time to go over this plea with your client carefully?

7              MS. RUTTENBERG:  I have, Your Honor.

8              THE COURT:  Are you satisfied that it accords with

9    your understanding of the facts and circumstances?

10             MS. RUTTENBERG:  Yes, Your Honor.

11             THE COURT:  And that it accords with your

12   understanding of your client's wishes in this case?

13             MS. RUTTENBERG:  Yes, Your Honor.

14             THE COURT:  All right.  Based on these answers to the

15   Court's questions, I'm finding that the defendant has entered

16   her plea in a knowing and voluntary fashion, with the full

17   advice of competent counsel, and that the facts as described in

18   the statement of facts and orally as well are more than

19   sufficient to establish guilt beyond a reasonable doubt.

20             I see no reason why we should not do a sentencing

21   today, and let me just -- let's see, I'm going to dismiss the

22   indictment and hear first from the government as to its

23   position on sentencing.

24             MS. PEDERSEN:  Your Honor, in this case, there is a

25   term of probation which is authorized by statute.  In this

24

1    case, the defendant photo retouched over 1,500 images, one of

2    which she's just admitted to removing the copyright off of.

3    She made approximately $30,000 in income from working for these

4    three agencies for which she edited photos.

5            We do have copies of the e-mail correspondence which

6    form the basis for the Court's guilty plea -- for the

7    defendant's guilty plea before the Court.  If the Court were so

8    inclined, it's welcome to look at the e-mail correspondence and

9    the attached photos.  The attached photos are substantially

10   more cleaned up than the 1,500 images that she photo retouched

11   for these agencies.

12           We hope that this defendant will be mindful of the

13   fact that escort services exist, that they recruit women, that

14   they depend on photo images such as the over 1,500 images that

15   she photo retouched, that this is a dangerous business for both

16   the women involved and also for the clients, that we hope that

17   she's mindful that escort agencies exist primarily and solely

18   for prostitution.  There really are no escort agencies out

19   there that are engaged in nonsexual activity.  It's implicit in

20   an escort agency, and that's what they do.

21           We ask that the Court impose a sentence to advise her

22   and let her know that what she was doing was promoting these

23   businesses, and we ask the Court impose a sentence so that she

24   will no longer work for those type of agencies.  We ask for a

25   one-year period of probation to be imposed along with a fine in

25

1        this case as the Court sees appropriate.

2                THE COURT:  All right.  Ms. Ruttenberg?

3                MS. RUTTENBERG:  Your Honor, the defense first of all

4        for the record disagrees with the characterization that the

5        government presented about the number of photographs that were,

6        that were edited by Ms. Churchill.  We actually had someone go

7        through and count one by one the number of pictures that were

8        edited.  I didn't actually think we were going to be getting

9        into this level of detail, so I didn't bring the exact numbers

10       with me, but it was approximately 1,300 photographs.

11               It was approximately 350 different women in those

12       1,300 photographs, and 17 of them were what I define as

13       explicit, meaning that there was frontal bottom nudity, as

14       opposed to topless photographs.  The majority of them were

15       scantily clad photographs, as the government described in the

16       indictment.

17               So I raise that simply for record purposes, and we

18       would have called that individual at trial to testify.

19               Ms. Churchill worked as a photo -- well, let me back

20       up.  Ms. Churchill began working as -- in a nurse-type capacity

21       for a hospital right out of high school.  It was a dream of

22       hers to be a nurse since her father -- her grandfather became

23       ill with cancer when she was in high school and she was

24       inspired by the nurses.

25               She was looking for work after she obtained her GED,

26

1  and she took a temporary position at Mission Hospital that was

2  only two weeks, that had no benefits attached to it, and turned

3  down a different position that would have had benefits and

4  would have been a permanent position with a higher salary

5  because she thought it was her way of getting into becoming a

6  nurse.  She didn't have the kind of education and background

7  that she thought would let her do this in the conventional way.

8  And she worked there for about three years -- four years, I'm

9  sorry, four years working with patients, doing essentially

10 nursing duties.

11         When she met her now ex-boyfriend, the gentleman that

12 we talked about in court that's also the father of her son, he

13 was a photographer in Los Angeles.  She had never done any

14 modeling before.  She came to meet him, they developed a

15 relationship, and she quit her job at the Mission Hospital

16 because the two of them moved in together in Los Angeles and

17 the commute was, was too far to be doing.  She was working long

18 shifts.

19         And I raise that simply to let the Court know that

20 this was not some fly-by-night decision of hers to become a

21 nurse.  This is something that she's wanted to do for a long

22 time.

23         As she developed this relationship with her

24 ex-boyfriend, who was a photographer, she learned how to

25 retouch photographs.  She also began modeling and getting

1    modeling gigs for all legitimate businesses, like energy

2    drinks, in the automotive industry, magazines, cell phone

3    companies, and she was posing in scantily clad pictures for

4    these magazines in the context of that -- of those different

5    clients.

6            She was also doing hosting gigs, where there would be

7    a promotional event and they would hire women to hand out for

8    again things like cell phone services and sports companies,

9    hand out promotional materials, go to car shows, things like

10   that.

11           She -- during the course of her relationship with her

12   ex-boyfriend, she retouched over 5,000 photographs, and those

13   5,000 photographs were almost entirely in what's considered the

14   glamour industry, where it's sexy pictures of women who are

15   scantily clad and provocatively posed.

16           She was referred to Mr. Akuiyibo in this case by her

17   ex-boyfriend in December of 2009.  She knew nothing about them,

18   but she began doing retouching for, for those individuals.

19           Approximately a month after she obtained this, this

20   client, she and her ex-boyfriend broke up, which is why the

21   other retouching work that she did ended.  It was all

22   retouching work that she did in connection with his business,

23   and he would offer to the clients a package deal of photography

24   and retouching.

25           It's important that I raise that, Your Honor, because

1   her income doesn't reflect prior to working with Classy DC

2   Escorts and the other companies that she was doing all of this

3   photo retouching work and that that was -- but she wasn't paid

4   for it, because it was actually money that was going to her

5   ex-boyfriend.  She was living with him at the time.

6          When she finished the relationship with him, she was

7   no longer working on any of that -- of those clients'

8   materials, so she over the span of over two years edited

9   approximately 1,300-some photographs, retouched those

10  photographs for this Classy business and the other two

11  businesses.

12         At the same time, she was starting to develop her own

13  Web site to advertise retouching, and she had other clients as

14  well.  Some were models, one was a hairdresser, one was another

15  kind of a stylist, a makeup artist.  Another was a freelance

16  photographer who also happened to be an emergency room doctor

17  but had a separate business doing photography, landscape

18  photography and glamour.

19         So she was working on all of that at the same time in

20  addition to obtaining her nursing license and taking on this

21  nursing career again.  She obtained her LVN, licensed

22  vocational nurse.  She hopes to go back and obtain a registered

23  nurse license, and her ultimate goal is to get her bachelor's

24  in nursing, and she wants to be a nurse.  She's always wanted

25  to be a nurse, and she's been pursuing that.

1          At the present, she is a nurse in a hospice facility

2    in California.  That is her primary and at this point

3    essentially sole source of income.

4          I think I can represent to the Court from my

5    communications with Ms. Churchill that this case has certainly

6    taught her a lot about how the government views a photo

7    retoucher working on these types of photographs for an escort

8    agency.  She has maintained from the beginning of this case and

9    continues to, which is why we're not here on a plea that has

10   anything to do with her knowledge of what Classy DC Escorts and

11   their cohorts were, that she did not know that this was a

12   prostitution enterprise.

13         Did she know that some escorts would cross the line

14   into prostitution?  I'm sure she did.  We all sort of make that

15   assumption, but in Los Angeles, there's also a very different

16   culture there, and there is a whole spectrum of what escorts

17   are and what they do.

18         Some of the *Brady* materials in this case reflect that

19   at least three other people involved with this service did not

20   know that Classy Escorts was prostitution until for one of

21   them, he started collecting money, for another one, they

22   started speaking on the phone with the johns and the

23   prostitutes, and for another one, who had actually designed the

24   Web site for Classy, he didn't realize it until he started

25   designing a second Web site and started collecting money.

1          So the idea that Ms. Churchill would know that -- and

2    I've reviewed now from what was produced the other night the

3    grand jury testimony of the, the agent in the case, the case

4    agent, who was also testifying about their belief that

5    Ms. Churchill knew about the prostitution because of these

6    scantily clad photographs and the fact that it was called an

7    escort service and that's it.

8          So certainly Ms. Churchill was mortified by this

9    case, very embarrassed by it because of what she was accused

10   of, and she's here taking full responsibility for the

11   copyright, which we found as we were going through these many,

12   many photographs, and we found this photograph that had a

13   copyright removed.  She knows full well that a copyright is a

14   mark that gives credit to a photographer, and that's what she's

15   here for.

16         And the last thing that I would mention since the

17   government brought up the income is that Ms. Churchill reported

18   all of this income on her taxes, which again from the materials

19   we've received from the government appears to be contrary to

20   what the other, the other individuals in this case did or were

21   accused of doing in terms of laundering the money and trying to

22   support a lavish lifestyle.

23         Ms. Churchill received $20 per photograph, which was

24   exactly what she had received for every other client.  She had

25   no different means of interaction with these individuals than

31

1    any other client.  The typical mode of being a retoucher is

2    getting e-mailed the photograph, almost like a car mechanic,

3    and you get the photograph, here's what's wrong with it, fix

4    it, send it back, get paid.

5          And there's just simply no question about, unless

6    there's something in the photograph, like it's a child, it's

7    just a photograph, and she was so used to seeing and posing for

8    these scantily clad photographs.

9          But at the same time, she's not doing any work, she's

10   not doing any retouching work for anybody who identifies as an

11   escort.  She certainly was spooked by this case, Your Honor,

12   and she has no intention of doing that again.

13         THE COURT:  All right.

14         MS. RUTTENBERG:  So we would simply ask, Your Honor,

15   that if the Court chooses to impose a sentence of probation on

16   Ms. Churchill, that it be a limited period of time and that it

17   be unsupervised.  She's been on supervised release and has had

18   no problems with the supervised release since her arrest.

19         She's suffered a lot in the course of this case,

20   certainly had to let people know about it in terms of

21   witnesses, etc., and her family, is on anxiety medication, and

22   so we would simply ask that the Court take all of that into

23   consideration when the Court imposes sentence, and she thanks

24   the Court for that consideration.

25         THE COURT:  All right.  Ms. Churchill, come up to the

32

1    lectern.  Is there anything you'd like to say before sentence
2    is imposed?
3              THE DEFENDANT:  No, Your Honor.
4              THE COURT:  No?  All right.  So you're working now
5    full time as a nurse?
6              THE DEFENDANT:  Yes.
7              THE COURT:  I mean, and you're totally out of the
8    retouching business?
9              THE DEFENDANT:  I still edit for a couple of my
10   clients.
11             THE COURT:  All right.  You understand there's a line
12   that could be crossed, so you need to be very careful on who
13   you choose as clients.
14             THE DEFENDANT:  Yes.
15             THE COURT:  Well, I think in this case, throughout
16   the country, the resources of our federal Probation Offices are
17   very taxed because of the budgetary restrictions that are being
18   imposed.  This is not a case in my view that calls for
19   probation.
20             I think the fine should be imposed to some degree
21   because you have cost the government some money in having to
22   bring you here, etc., but you've saved the government so much
23   more money by not having to try this case, and it would have
24   been a tough case to try, and I think this plea is a brilliant
25   plea, an excellent example of good lawyering and reasonable

33

1    negotiating.  The government achieves its purpose of having a

2    conviction of some sort on this defendant's record, and I think

3    I'm satisfied the defendant has clearly gotten the message in

4    this case.

5            To have gone through nursing school for several years

6    and being, working in that field right now, having faced a

7    potentially very serious felony case, I don't sense from her

8    background or anything I've seen or heard in this case any

9    reason to believe that there'll be any danger of recidivism.

10           And so I'm going to impose in this case a fine of

11   $500 and give you six months to pay it.  Now, if the fine is

12   not paid within six months, you should understand that the

13   United States Attorney's Office has a special office that can

14   go after you.  They could garnish your wages and create other

15   problems for your credit.  So it's to your advantage to get

16   that paid as quickly as possible.

17           Now, the special assessment for an infraction, I

18   think, is 20?

19           MS. HAYNES:  Five.

20           THE COURT:  How much?

21           MS. HAYNES:  $5, Your Honor.

22           THE COURT:  Are you positive?  When I was a

23   magistrate judge, it was never that low.  Would you look that

24   up?

25           MS. PEDERSEN:  Your Honor, if I may --

34

1              THE COURT:  Yeah.

2              MS. PEDERSEN:  -- point the Court to 18 U.S.C.

3    3013 --

4              THE COURT:  All right, hold on.

5              MS. PEDERSEN:  -- which is special assessment on

6    convicted persons, subsection (a):  "The court shall assess on

7    any person convicted of an offense against the United States,

8    subsection (1), in the case of an infraction or a misdemeanor,

9    (A), if the defendant is an individual, (i) the amount of $5 in

10   the case of an infraction, or a class C misdemeanor."

11             So it appears as if it's $5.

12             THE COURT:  All right.  So it's going to be a $5

13   special assessment that must be paid, that hopefully you can

14   pay it today, and then a $500 fine which must be paid within

15   six months of today's date, but as I said, the government will

16   collect that from you involuntarily if you don't do it

17   voluntarily.  The sooner you pay it, the better.

18             THE DEFENDANT:  Yes.

19             THE COURT:  I'm not imposing any interest on that,

20   and I've dismissed the complaint -- the indictment, so this

21   case is now terminated.  All right?

22             THE DEFENDANT:  Thank you, Your Honor.

23             MS. RUTTENBERG:  Your Honor?

24             THE COURT:  Yes.

25             MS. RUTTENBERG:  May I just raise two housekeeping

35

1   matters --

2         THE COURT:  Yes, go ahead.

3         MS. RUTTENBERG:  -- which I'm very reluctant to raise

4   after this discussion?

5         THE COURT:  Go ahead.

6         MS. RUTTENBERG:  Ms. Churchill worked with the

7   Marshals Office, and her flight was arranged by them.  Under

8   the statute -- and I was very careful how I worded my motion,

9   but under the statute, it provides that the Marshals Service

10  will arrange her transportation and pay for her flight to the

11  trial.  Because it didn't say round trip, I didn't want to push

12  my, my luck, but what they told us was they're happy to arrange

13  it; they do it all the time.  I just need a court order for it.

14        THE COURT:  We'll get you an order.

15        MS. RUTTENBERG:  And they said to make it, if the

16  Court would be willing, Ms. Churchill having come in on the

17  red-eye, we do have one night of hotel for her here.  If she

18  could leave tomorrow afternoon, that would allow her to at

19  least get some sleep tonight, but they said that it's got to be

20  specific in the order.

21        And the second question, Your Honor, is this:  We had

22  filed our motion for the Court under 18 U.S.C. 4285 to pay for

23  travel expenses, and the Court did grant that order, which

24  would have included her hotel, etc., but by the time we got the

25  Court's order, we were beginning to get concerned about whether

36

1   there was going to be availability for a hotel, so

2   Ms. Churchill went ahead to get the very cheapest rate she

3   could, and she Pricelined the hotel, meaning she put in a --

4           THE COURT:  I know what it is.

5           MS. RUTTENBERG:  And so she got a fantastic rate of

6   $131 at the Westin here, but she can't get that back, and it's

7   over $1,000.

8           THE COURT:  I'm sorry?  You said it was for $131.

9           MS. RUTTENBERG:  It was for $131, Your Honor, but

10  based on the government's and our expectation of the length of

11  the trial, she was expecting to come in Friday night, tonight,

12  to prepare during the weekend with counsel, start her trial on

13  Monday, and we have her staying, checking out Saturday morning,

14  assuming that the trial would be over on Friday.

15          So she booked the hotel to make sure she had a place

16  to stay for the trial, and in total it was -- with $131.43 per

17  night on Priceline, with minimal taxes attached to the room, it

18  was $1,184.24.

19          And she, she actually didn't pay for it.  Her mother

20  had to pay the money because Ms. Churchill just doesn't have

21  it, and so she will be paying back her mother somehow out of

22  her paycheck over some amount of time.  She now has, obviously,

23  this fine, which is, hopefully her mother will see as more

24  pressing, but we would ask the Court that in light of -- she

25  was trying to do the responsible thing and make sure she had a

1    place to be here.

2           Under the ethics rules, we didn't think that we could

3    even though we were pro bono pay for our client's hotel,

4    although obviously, we paid for the various witnesses, and

5    certainly we're not seeking that back, that's the risk that we

6    take, but she did this in a way to get an exceptionally low

7    rate, which is what the marshals would have been reimbursing

8    her for as 131 a night.  On average when we were pricing it

9    out, it was over $200 a night at that Westin, well over $200

10   every time we looked.

11          So I was going to ask the Court if the Court would be

12   willing to also order that just for that hotel time, in

13   addition to the return flight, which they apparently do

14   routinely and it's my fault for not knowing that based on the

15   statute, that the Court order that they reimburse her that

16   figure since it was really through no fault of her own, that

17   she was trying to do the responsible thing, get it as cheaply

18   as she could and book it.

19          And although we had had some plea discussions with

20   the government weeks ago and this was a plea that we had

21   raised, the government was very clear that it was rejected, and

22   we had had absolutely no plea discussions with the government

23   since, very much were preparing to go to trial.  We even

24   brought our exhibit binders today if the Court didn't accept

25   the plea.  We're ready to go.  And this didn't come up until --

1    what is today? -- until Wednesday of last week.  When I reached

2    them was late afternoon.

3            I'm sorry, Your Honor, I'm losing track of what day

4    it is.  Wednesday of this week.  So that was our, our request

5    to the Court.

6            THE COURT:  Does the government want to speak to

7    that?

8            MS. PEDERSEN:  I mean, you know, I don't know what to

9    say, Judge, in a situation like that about money.  I know the

10   government puts up witnesses all the time.  We find cheap

11   rates.  There's a suites right across the road from our office,

12   it's like a Marriott.  It's not a fancy Westin.

13           That amount seems like a large amount of money.  I

14   think 131 would be a reasonable amount to reimburse.  No reason

15   to predict you have to stay here a whole week for a trial.

16   Ultimately, it's the Court's decision, but, you know, I think

17   reasonable, not a thousand dollars doesn't seem to be

18   reasonable.  131 seems closer to reasonable.

19           THE COURT:  The problem is, quite frankly, the

20   Marshals Service themselves do not believe that they're legally

21   obligated to pay for the hotel and food.  This is actually an

22   area of dispute.

23           I'm only willing to have the Marshals Service

24   reimburse for the night the defendant actually had to be here

25   at the hotel, and the other nights, that's something that

39

1    she'll just have to absorb, all right?

2            MS. RUTTENBERG:  Understood, Your Honor.  I

3    appreciate your consideration for the request.

4            THE COURT:  All right, so that concludes this case.

5    Anything further?

6            MS. PEDERSEN:  Not from the government, Your Honor.

7    Thank you.

8            THE COURT:  All right, then we'll recess court for

9    the day.

10                        (Which were all the proceedings

11                         had at this time.)

12

13                   CERTIFICATE OF THE REPORTER

14       I certify that the foregoing is a correct transcript of

15    the record of proceedings in the above-entitled matter.

16

17

18    _____
                              /s/
                         Anneliese J. Thomson
19

20

21

22

23

24

25